# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

THE TRAVELERS INDEMNITY
COMPANY,

   *Plaintiff,*

vs.

   Case No. 18-01287-EFM

P1 GROUP, INC.,

   *Defendant.*

## MEMORANDUM AND ORDER

  Plaintiff The Travelers Indemnity Company ("Travelers") is suing Defendant P1 Group, Inc. ("P1") to recover the amount it paid under an insurance contract with McPherson Hospital (the "Hospital"). Before the Court are the Parties' cross-motions for partial summary judgment (Doc. 46 and 49). For the following reasons, the Court denies P1's motion and grants in part and denies in part Travelers' motion.[1]

---

[1] P1 additionally filed a Motion for Hearing regarding its Motion for Partial Summary Judgment (Doc. 61). The Court denies that motion now and will consider P1's corresponding Motion for Hearing regarding its Motion to Exclude Testimony at a later date.

## I. Factual and Procedural Background[2]

Travelers is an insurance company that provided property insurance to the Hospital, which operates in McPherson, Kansas. Travelers is subrogated to the rights of the Hospital in this case. P1 provides facilities maintenance services, including plumbing repairs, to the Hospital. As part of these services, P1 replaced a drain pipe in the Hospital's mechanical room.

On October 18, 2016, the Hospital experienced flooding that damaged its property. The flooding resulted from a burst water softener drain line—installed by P1—in the Hospital's mechanical room. After a nurse discovered the flooding during the morning shift, the Hospital discharged all patients and closed for the remainder of October 18. The Hospital reopened on October 19, but doctors did not complete scheduled surgeries on the 19th or 20th. The Hospital resumed surgeries on the 21st.

The Hospital's insurance policy with Travelers stated:

> We [Travelers] will pay for the actual loss of Business Income you sustain due to the necessary "suspension" of your "operations" during the "period of restoration" caused by direct physical loss of or damage to property at premises which are described in the Declarations and for which a Business Income Limit of Insurance is shown in the Declarations.

The contract stated that in exchange for insuring the Hospital, Travelers was subrogated "to the extent of our [Travelers'] payment" to the Hospital. The Hospital also had a deductible for business interruption damages. The contract stated, in relevant part:

> An hour deductible applies to your Business Income coverage. We will not pay for loss of Business Income in any one occurrence that is incurred during the period of time that:
> a. Begins at the time of the direct physical loss or damage that triggers the Business Income coverage; and

---

[2] The facts come from the Pretrial Order and the Parties' motions and are viewed in the light most favorable to the respective non-moving party.

b.  Continues for the consecutive number of hours shown in the Declarations as the applicable Business Income hour deductible.

This deductible prohibited the Hospital from makings claims for the 72 hours immediately following the physical damages. As such, the deductible period for the flood damage began on October 18 and terminated on October 20.

Following the flood, the Hospital filed a business interruption claim with Travelers. Travelers calculated the Hospital's business interruption damages based on financial information provided by the Hospital's controller, Tania Thompson. Thompson indicated that the Hospital delayed—but did not entirely cancel—surgeries scheduled for October 18-20. The Hospital eventually performed those postponed surgeries. Based on this information, Travelers' accountant, Jeffrey Perry, calculated the Hospital's damages.

The Hospital's insurance policy with Travelers included the following terms governing Travelers' determination of any business interruption damages:

> a. The amount of Business Income loss will be determined based on:
> (1) The Net Income of the business before the direct physical loss or damage occurred;
> (2) The likely Net Income of the business if no physical loss or damage occurred, . . .
> (3) The operating expenses, including payroll expenses necessary to resume "operations" with the same quality of service that existed just before the direct physical loss or damage; and
> (4) Other relevant sources of information, including:
> (a) Your financial records and accounting procedures;
> (b) Bills, invoices and other vouchers; and
> (c) Deed, liens or contracts.
> b. Resumption of Operations
> We will reduce the amount of your Business Income loss to the extent you can resume your "operations" in whole or in part, by using damaged or undamaged property (including merchandise or "stock") at the described premises or elsewhere and, with respect to the Business Income From Dependent Property Additional Coverage, by using any other available source of materials or outlet for your products.

c. If you do not resume "operations", or do not resume "operations" as quickly as possible, we will pay based on the length of time it would have taken to resume "operations" as quickly as possible.

Perry did not determine business interruption damages for October 18-20, because those days were within the deductible period. Rather, Perry calculated that the business interruption damages by averaging the income the Hospital received on a daily basis from July 1, 2015 through June 30, 2016, and then comparing this to the income the Hospital actually received on October 21-23. Perry found that the Hospital suffered $69,631.92 in business interruption damages on October 21-23. Travelers paid this amount to the Hospital.

Bryan Cline, P.E., provided a report on behalf of the Hospital as an expert witness. In it, he states that the damage resulting from the broken water line can be attributed to the following causes:

- the pipe and connected fixtures were in a four-foot deep, sunken room with little or no outlet for water, and they were supplied by a 3-inch water main;
- the plastic pneumatic lines for the control valves of the water softener system were vulnerable to inadvertent damage;
- the pneumatic control valves on the water softener system failed in the open position opening the municipal water supply line into the plant;
- no check valve was installed in the wastewater pipe that was connected to the sump pump discharge line to prevent backflow to the water softeners;
- the sump pump was not sized to pump water that came from the municipal water supply;
- the sump pump system was not independent of the water supply line, but was connected to it;
- the Hospital left the boiler room unattended without having a monitoring or warning system that would have given notice to the hospital personnel of the water intrusion;
- the Hospital operated its water softener system during the night and early morning hours when none of its employees were present to discover a water intrusion.

Cline further testified that an unidentified Culligan's Water franchisee ("Culligan's") installed the plastic pneumatic lines for the control valves of the water softener system in a manner that

made them vulnerable to inadvertent damage. Cline's report states that Culligan's should have installed valves that closed if the pneumatic lines failed or disconnected, which would have stopped the flow of water through the pipe system.

Travelers brought this suit alleging that P1 negligently installed the water softener drain line in the Hospital's mechanical room, causing it to burst and flood the room, resulting in $237,008.24 in damages which includes $69,631.92 in lost business income. P1 now moves for partial summary judgment on Travelers' lost business income claim. Travelers moves for partial summary judgment on P1's comparative fault contentions.

## II. Legal Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law.[3] A fact is "material" when it is essential to the claim, and issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor.[4] The movant bears the initial burden of proof and must show the lack of evidence on an essential element of the claim.[5] The nonmovant must then bring forth specific facts showing a genuine issue for trial.[6] These facts must be clearly identified through affidavits, deposition transcripts, or incorporated exhibits—conclusory allegations alone cannot survive a motion for summary

---

[3] Fed. R. Civ. P. 56(c).

[4] *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006).

[5] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[6] *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005).

judgment.[7] The court views all evidence and reasonable inferences in the light most favorable to the party opposing summary judgment.[8]

### III. Analysis

**A.     P1's Motion for Partial Summary Judgment (Doc. 46)**

Travelers alleges that it is subrogated to the legal rights of the Hospital, including the Hospital's right to recover any potential lost business income from P1.  P1 argues that Travelers is not subrogated to the Hospital's right to recover lost business income because Travelers was not required to pay those damages under the insurance contract and it therefore mistakenly paid $69,631.92 to the Hospital when it was not contractually obligated to.

"Subrogation is the right of one who has paid an obligation which another should have paid to be indemnified by the other."[9]  "Kansas recognizes both conventional and equitable subrogation."[10]  Conventional subrogation is based on a contract entered into by the parties while equitable subrogation "arises by operation of law without regard to any contractual relationship."[11]  In this case, to the extent that it is subrogated at all, Travelers is conventionally subrogated to the Hospital since it entered into an insurance contract with the Hospital in exchange for the assumption of the Hospital's rights, if any, to legal recourse.

---

[7] *Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197 (10th Cir. 2000) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[8] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

[9] *Old Colony Ventures I, Inc. v. SMWNPF Holdings, Inc.*, 924 F. Supp. 1076, 1079 (D. Kan. 1996) (citing *Neises v. Solomon State Bank*, 236 Kan. 767, 696 P.2d 372, 381 (1985)).

[10] *Id.* (citations omitted).

[11] *Fenly v. Revell*, 170 Kan. 705, 228 P.2d 905, 908 (1951).

An insurance policy is a contract and the interpretation of a contract is a question of law.[12] "Where the language of an insurance policy is clear and unambiguous, we must apply it in its plain and ordinary sense."[13] An insurer is subrogated only to the extent of the amount that it was required to pay under the terms of its contract.[14] However, "[p]ayment based on a legitimate but mistaken belief that such payment is owed does not defeat a right to subrogation."[15] Although a subrogated insurer has no duty to collect the deductible lost by the insured, it nevertheless may choose to do so.[16]

The plain language of the insurance contract is unambiguous. It stated that Travelers was subrogated "to the extent of our [Travelers'] payment" to the Hospital. This clause limits the amount—but not the type—of damages Travelers can recover in a subrogation action. It cannot recover amounts otherwise owed to the Hospital. For instance, if the Hospital suffered $100 in damages from a tortfeasor, and for whatever reason Travelers determined that it only owed the Hospital $70 under the insurance policy, then Travelers could pursue the tortfeasor to recuperate the $70, but not the remaining $30. Any damages the Hospital suffered beyond Travelers' policy payment can be recovered by the Hospital alone, not Travelers.

P1 disputes the type of damages that Travelers can recover via this subrogation action. P1 also disputes the method of calculating the Hospital's damages; namely, whether lost business income can include postponed surgeries. These are ultimately factual issues for a jury to

---

[12] *BancInsure, Inc. v. F.D.I.C.*, 796 F.3d 1226, 1233 (10th Cir. 2015).

[13] *Id.* (citing *Warner v. Stover*, 283 Kan. 453, 153 P.3d 1245, 1247 (2007)).

[14] 16 STEVEN PLITT ET AL., COUCH ON INS. § 223:25 (3d ed. 2019).

[15] 3 EUGENE G. BECKHAM, LAW AND PRAC. OF INS. COVERAGE LITIG. § 42:6 (2019).

[16] 3 EUGENE G. BECKHAM, LAW AND PRAC. OF INS. COVERAGE LITIG. § 42:49 (2019).

decide.[17] The type of damages Travelers included in its calculation, whether its calculation method was incorrect, and what method it should have used instead are all issues of fact reserved for a jury. At trial, P1 can attempt to impeach Travelers' evidence by presenting its own evidence and arguments that Travelers' mistakenly paid the Hospital for lost business income. But P1 cannot defeat Travelers' claim at this stage of the proceedings because the contractual language limits the amount—not the type—of damages, that Travelers can recover, and it is only seeking to recover what it paid the Hospital.

Additionally, P1 argues that Travelers mistakenly and unreasonably paid the Hospital for lost business income during the deductible period and as a result, Travelers cannot recover those amounts. To support its argument, P1 relies on a footnote in the Tenth Circuit's decision in *Weir v. Federal Insurance Company*.[18] However, in that case the court was concerned with unreasonable settlement practices that excessively increased the amount insurers paid to insureds.[19] The court noted that only good faith settlement amounts could be recovered in a subsequent subrogation action; otherwise, insurers could seek recovery in bad faith for damages the insured never sustained.[20] The court did not address whether *calculations* by the insurer as to the amount of damages sustained by the insured are subject to the same good faith analysis. Even assuming that they are, there is no evidence in the record in the present case that Travelers

---

[17] *See Zenda Grain & Supply Co. v. Farmland Indus., Inc.*, 20 Kan. App. 2d 728, 894 P.2d 881, 895-96 (1995) (holding that evidence of farmers' cooperative's lost profits was an issue of fact to be decided by a jury); *Cerretti v. Flint Hills Rural Elec. Co-op. Ass'n*, 251 Kan. 347, 837 P.2d 330, 342 (1992) (in a negligence action the court held "[i]t is the function of the trier of fact to determine the amount of damages that should be awarded to a party, based upon evidence of the loss suffered").

[18] 811 F.2d 1387 (10th Cir. 1987).

[19] *Id*. at 1395 n.6 ("But if an insurer was allowed to make a payment *unreasonably and in bad faith* and then pursue a subrogation action, the subrogee would be liable for many payments for which no obligation existed.").

[20] *Id*.

calculated the Hospital's damages in bad faith in order to recover more in a subsequent subrogation action.

The Court denies P1's motion for partial summary judgment on Travelers' lost business income calculations. P1 disputes that Travelers is subrogated to the extent of its entire payment to the Hospital, arguing that Travelers mistakenly paid for lost business income. But the insurance contract between Travelers and the Hospital clearly limits the amount, but not the type, of damages that Travelers could recover in a subrogation action. Whether the Hospital actually lost business income due to the flood is a central question of fact for a jury. Furthermore, there is no evidence that Travelers paid the Hospital for lost business income in bad faith. P1 can dispute Travelers' method of calculating its payments at trial, but it cannot defeat Travelers' claim at this stage of the proceeding. As such, the Court denies P1's motion for partial summary judgment.

**B.     Travelers' Motion for Partial Summary Judgment (Doc. 49)**

Under a theory of comparative fault, P1 argues that the Hospital, Travelers, Culligan's, "all engineers," and "all contractors" were negligent or otherwise at fault in causing or contributing to the cause of the flood. Travelers moves for summary judgment on this comparative fault claim, arguing that, since expert witness testimony thus far fails to specifically identify relevant standards of care, P1 has failed to provide evidence supporting a necessary element of its comparative negligence defense.

As a preliminary matter, P1 argues that Travelers' motion for summary judgment is actually an untimely objection to P1's expert witness disclosure pursuant to Rule 26. The pertinent part of Rule 26 reads:

(B) Witnesses Who Must Provide a Written Report. Unless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report—prepared and signed by the witness—if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony. The report must contain:
> (i) a complete statement of all opinions the witness will express and the basis and reasons for them;
> (ii) the facts or data considered by the witness in forming them;
> (iii) any exhibits that will be used to summarize or support them;
> (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years;
> (v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and
> (vi) a statement of the compensation to be paid for the study and testimony in the case.[21]

The Court concludes that Travelers' motion for summary judgment is not an untimely objection to P1's expert witness disclosure. Travelers' arguments do not go to technical flaws in the expert testimony, but rather attack the testimony's sufficiency in establishing essential elements of the comparative fault claim. It does not object to the witness's qualifications, past history, compensation, or method and basis for opinions. Travelers simply argues that the expert failed to provide any evidence to establish a necessary element of P1's comparative negligence claim. As such, the Court will not deny Travelers' motion on the basis of P1's Rule 26 argument.

Moving on to the substance of Travelers' motion for summary judgment, the Court now considers P1's comparative fault defense. "Under comparative fault, a plaintiff may recover damages so long as the plaintiff's negligence is less than the collective causal negligence of the other parties to the occurrence; but those damages are diminished in proportion to the plaintiff's

---

[21] Fed. R. Civ. P. 26(a)(2)(B).

own negligence."[22]  "Under the statute and the case law it is clear that one must first be a tortfeasor, must be negligent or at fault, before one can be made a party subject to having his negligence compared and liability allotted for his proportion of the damages suffered by the injured party."[23]  "[N]egligence exists where there is a duty owed by one person to another and a breach of that duty occurs and, if recovery is to be had for such negligence, the injured party must show a causal connection between the duty breached and the injury received, and that he or she was damaged by the negligence."[24]  "Normally, the presence or absence of negligence is a question of fact reserved for the jury."[25]  "These issues, however, may be resolved on summary judgment when the facts present only one reasonable conclusion."[26]

Travelers argues that expert testimony is required to establish the relevant standard of care under P1's negligence claim.  "Whether expert testimony is necessary to prove negligence is dependent on whether, under the facts of a particular case, the trier of fact would be able to understand, absent expert testimony, the nature of the standard of care required of defendant and the alleged deviation from the standard."[27]  "The primary purpose of expert testimony is to establish the community standards for the benefit of the trier of fact when the facts are somewhat alien in terminology and the technological complexities would preclude an ordinary trier of fact from rendering an intelligent judgment."[28]  Courts have ruled that expert testimony is necessary

---

[22] *Simmons v. Porter*, 298 Kan. 299, 312 P.3d 345, 351 (2013) (citing K.S.A. § 60–258a).

[23] *Akins, By & Through Akins v. Hamblin*, 237 Kan. 742, 703 P.2d 771, 776 (1985).

[24] *Id.*

[25] *Nolde v. Hamm Asphalt, Inc.*, 202 F. Supp. 2d 1257, 1261 (D. Kan. 2002) (citing *Honeycutt v. City of Wichita*, 247 Kan. 250, 796 P.2d 549, 551 (1990)).

[26] *Id.* (citing *Lay v. Kansas Dep't of Transp.*, 23 Kan. App. 2d 211, 928 P.2d 920, 924 (1996)).

[27] *Smart v. BNSF Ry. Co.*, 52 Kan. App. 2d 486, 369 P.3d 966, 977 (2016) (citations and quotations omitted).

[28] *Juhnke v. Evangelical Lutheran Good Samaritan Soc.*, 6 Kan. App. 2d 744, 634 P.2d 1132, 1137 (1981).

in cases involving physical harm resulting from sexual assault,[29] the sale of complex farm equipment,[30] and workplace exposure to unreasonable ergonomic risk factors.[31] On the other hand, Courts have ruled that expert testimony is unnecessary to establish the standard of care applicable to a nursing home to protect other patients from a known violent patient.[32]

The Court concludes that expert testimony is required to establish the standard of care governing the design, installation, and maintenance of the Hospital's mechanical room. Architectural and engineering design, plumbing installation, and industrial mechanical-room maintenance are not within the general purview of a common juror's knowledge. The subject matter is complex and the language alien and technical. Without hearing expert testimony on the standards of care common to such things, a trier of fact would not be able to understand the nature of the standard of care required of the Hospital, Travelers, Culligan's, or the engineers and contractors in this case.

The Court concludes that P1 has shown sufficient evidence establishing the standards of care for the Hospital and Culligan's. However, P1 has failed to establish the standards of care for Travelers, "all engineers," and "all contractors." As to the Hospital's operation of its mechanical room, P1's expert, Bryan Cline, reported multiple factual bases to allow a juror to reasonably conclude that the Hospital was partially at fault for the flood. P1 contends that the Hospital discharged hot water into the water softener drain line when it knew it should not have, that the Hospital failed to install supporting braces for the pipe, and that it knew the pipe was

---

[29] *P.S. ex rel. Nelson v. The Farm, Inc.*, 658 F. Supp. 2d 1281, 1306 (D. Kan. 2009).

[30] *Gaumer v. Rossville Truck & Tractor Co.,* 41 Kan. App. 2d 405, 202 P.3d 81, 84 (2009) (finding the standard of care of the seller of a used hay baler is outside the ordinary experience and common knowledge of the jury and beyond the capability of a lay person to decide), *aff'd*, 292 Kan. 749, 257 P.3d 292 (2011).

[31] *Smart v. BNSF Ry. Co.*, 52 Kan. App. 2d 486, 369 P.3d 966, 977 (2016).

[32] *Juhnke,* 634 P.2d at 1136.

sagging due to the lack of braces. These allegations imply a standard of care and support P1's argument that the Hospital's actions contributed to the flooding. Cline's report implies that the Hospital should have acted differently, according to a common standard of care under those circumstances. Based on the testimony given in the expert report, the average juror possesses a sufficient basis of knowledge to determine—at least by implication—whether the Hospital negligently operated its mechanical room. As such, the Court denies Travelers' motion for partial summary judgment as to P1's comparative negligence claim against the Hospital.

The Court further concludes that P1 has established standards of care for Culligan's installation of the commercial water softener system at the Hospital. Cline's report indicated that Culligan's failed to install certain protective systems around the water softener line. Similar to before, the report contains enough factual allegations to establish, via inference, the relevant standard of care that Culligan's should have observed. If Culligan's failed to install various fail-safe mechanisms, it is implied that it should have installed them. A reasonable juror could logically deduce the standards of care Culligan's should have observed based on Cline's report. The Court therefore denies Travelers' motion for summary judgment as to P1's comparative fault defense concerning Culligan's.

Next, the Court concludes that P1 has failed to establish the standard of care—or even a causal link—for Travelers' alleged negligence. While P1 lumps Travelers in with the Hospital, engineers, and contractors in sharing comparative negligence, it fails to allege any facts or supply any expert testimony on both the standard of care and causation elements. Quite frankly, the Court would be surprised if an insurance company caused damage to its client's property. The Court concludes that P1 has failed to provide evidence showing that Travelers—as an

independent actor—caused the flood, or what standard of care it should have observed under the circumstances.[33]

Lastly, the Court concludes that P1 has failed to meet its evidentiary burden for the comparative fault of "all engineers" and "all contractors" in designing and building the Hospital. P1's allegations lack specificity as to which engineers or contractors share fault in the flood damages. Rather, P1 alleges that engineers negligently designed the mechanical room and contractors negligently constructed, maintained, and operated it. These are merely cursory allegations and for that reason alone they succumb to summary judgment. Notably, P1 fails to provide any testimony, expert or otherwise, indicating the applicable standard of care governing these unidentified actors' conduct. Such a lack of evidence requires the Court to grant summary judgment to Travelers as to P1's comparative negligence defense concerning "all engineers" and "all contractors."

P1 has partially succeeded and partially failed to carry its burden to present factual allegations supporting all elements of its comparative negligence claims. Because standards of care governing the design, installation, and maintenance of the Hospital's mechanical room require alien terminology and unfamiliar technological complexities, P1 must point to expert testimony in the record establishing such standards. P1 points to enough expert testimony to establish standards of care governing the Hospital and Culligan's actions but fails to do so for Travelers, all engineers, and all contractors. As such, the Court denies in part and grants in part Travelers' motion for partial summary judgment on P1's comparative negligence claims.

---

[33] Since Travelers is subrogated to the rights and obligations of the Hospital, it remains potentially liable for the Hospital's comparative negligence.

Finally, P1 asks the Court to permit additional briefing so that it can move to amend the scheduling order. "A schedule may be modified only for good cause and with the judge's consent."[34] "The good cause standard primarily considers the diligence of the party . . . The party seeking an extension must show that despite due diligence it could not have reasonably met the scheduled deadlines."[35] In reviewing a motion for a new scheduling order to name a previously undisclosed witness, the Court considers four factors: (1) the prejudice to the party against whom the excluded witnesses would have testified, (2) the ability of that party to cure the prejudice, (3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or of other cases in court, and (4) bad faith or willfulness in failing to comply with the court's order.[36]

The Court declines P1's request for additional briefing to move to amend the scheduling order because P1 has failed to show good cause. Had P1 exercised due diligence during the discovery period, it would have sought and produced evidence to support each element of its comparative fault claim. At this late stage in the proceedings, allowing P1 to find an expert to testify as to the standards of care required for an unidentified number of actors and actions would significantly prejudice Travelers and substantially disrupt and delay the orderly and efficient trial of the case. Although P1 did not act in bad faith in excluding expert witness testimony in regard to its comparative fault claims, it nevertheless possessed ample time during discovery to obtain such evidence. Travelers would be unable to easily cure the prejudice against it and would likely

---

[34] Fed. R. Civ. P. 16(b)(4).

[35] *Deghand v. Wal–Mart Stores, Inc.*, 904 F. Supp. 1218, 1221 (D. Kan. 1995) (citations and quotations omitted).

[36] *Rimbert v. Eli Lilly & Co.*, 647 F.3d 1247, 1254 (10th Cir. 2011) (citations omitted).

have to significantly alter its strategy for the case. Therefore, under the discretion given to it in Rule 16, the Court denies P1's request to submit additional briefing on the matter.

**IT IS THEREFORE ORDERED** that Defendant P1 Group, Inc.'s Motion for Partial Summary Judgment (Doc. 46) is **DENIED.**

**IT IS FURTHER ORDERED** that Plaintiff The Travelers Indemnity Company's Motion for Partial Summary Judgment (Doc. 49) is **GRANTED IN PART** and **DENIED IN PART.**

**IT IS FURTHER ORDERED** that Defendant P1 Group, Inc.'s Motion for Hearing (Doc. 61) is **DENIED IN PART.** Motion is denied only with regard to the hearing on the Motion for Partial Summary Judgment. The motion for hearing on excluding testimony remains open.

**IT IS SO ORDERED.**

Dated this 5th day of March, 2020.

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE